IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 28, 2009 Session

## FRANKIE E. CASTEEL v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
**No. 257015     Jerry Scott, Senior Judge, Sitting by Designation**

**No. E2008-01526-CCA-R3-PC - Filed March 15, 2010**

The Petitioner, Frankie E. Casteel, appeals the Hamilton County Criminal Court's denial of his petition for post-conviction relief from his convictions for three counts of first degree murder. In this appeal, the Petitioner contends that the trial court erred in finding that he received the effective assistance of counsel. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Ruth H. Delange, Chattanooga, Tennessee, for the appellant, Frankie E. Casteel.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; William H. Cox, II, District Attorney General; M. Neal Pinkston, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Petitioner was convicted of the murders of Richard Mason, Kenneth Griffith, and Earl Smock. His convictions were reversed, and he was granted a new trial. State v. Frankie E. Casteel, No. E1999-00076-CCA-R3-CD, Hamilton County (Tenn. Crim. App. Apr. 4, 2001), app. denied (Tenn. Sept. 17, 2001). The Petitioner was again tried and convicted, and his case was affirmed on appeal. State v. Frankie E. Casteel, No. E2001-01563-CCA-R3-CD, Hamilton County (Tenn. Crim. App. Sept. 24, 2004), app. denied (Tenn. Dec. 28, 2004).

This court's opinion on direct appeal states the facts of the Petitioner's convictions:

Earl Smock and Kenneth Griffith were members of the same Air Force Squadron and were stationed at Ft. Walton Beach, Florida. The men, along with Mr. Griffith's wife, Paula Griffith, now Paula Kirby, drove to Hamilton County to visit their families for a few days. On Saturday afternoon, July 9, 1988, Richard Mason, Mr. Griffith's father-in-law, Mr. Griffith, and Mr. Smock set out from Mr. Mason's house on three all terrain vehicles ("ATVs"). Mr. Smock had brought his red, blue and white ATV with him from Florida, and Mr. Mason borrowed a red Honda ATV from his neighbor, Stanley Nixon, for Mr. Griffith to ride. Mr. Mason also owned a red Honda ATV. The men packed a cooler with drinks, and Mr. Mason wrapped a pistol in a towel and placed the pistol in the tool box beneath the Honda's seat. Mr. Griffith and Mr. Smock were not armed. Mr. Smock and Mr. Griffith had brought only shorts with them on the trip, so the two men put on green flight suits for the ride in the woods. The three men never returned.

Paula Kirby, Mr. Griffith's widow, testified that she did not become concerned about the men's absence until dusk. Ms. Kirby said that her husband was over six feet tall, and he weighed around two hundred pounds. Mr. Smock was heavier than her husband and two to four inches taller. Ms. Kirby said that she had lived on Signal Mountain since she was six, and her father was very familiar with the woods surrounding their property.

Mr. Nixon said that he had lived on the mountain for sixty years and often hunted with Mr. Mason. Mr. Nixon said that he did not know that Mr. Mason had borrowed his ATV until Ms. Mason called him on Sunday morning, July 10, to tell him that her husband had not come home the previous night. Mr. Nixon said, however, that it was not unusual for the two men to use each other's ATV. Mr. Nixon said that his ATV was basically the same type of ATV as Mr. Mason's.

After Ms. Mason's telephone call that Sunday morning, Mr. Nixon borrowed an ATV and began searching through the woods for the three men, but his efforts were unsuccessful. Mr. Nixon spotted tracks on the dirt trails near Mr. Mason's house

that appeared to have been made by ATVs. He followed the tracks around Jake's Campground and on the trail leading to Helican Road. He lost the tracks when he reached Vandergriff Road because that road was paved.

On Monday morning, Mr. Nixon joined one of the search teams along Helican Road which was a dirt road leading to a popular swimming hole known as the "blue hole." When the search team approached the gate that blocked Helican Road, Mr. Nixon said that about a seventy-five foot strip of the road had been "manicured." Mr. Nixon explained that it looked like someone had swept the dirt road with a pine branch. He also noticed two places where the grass was matted down. The search team later found blood and brain tissue in that area.

On cross-examination, Mr. Nixon clarified that the swept area of road was in front of the gate. The matted grass spots were about sixty or seventy-five feet from the Helican Road, and Mr. Griffith's knife was found about 200 yards in front of the gate. Mr. Nixon confirmed that nobody in the search party was wearing gloves.

Mr. Nixon said that he saw some other people camping in the woods when he first searched for the victims on Sunday, July 10. The family was camping near Chickamauga Creek where it crosses Vandergriff Road. Mr. Nixon said that a man was sitting on a blanket cleaning a gun while his family swam. Mr. Nixon said that he did not ask the man for his name.

Mr. Nixon also described an altercation he and Mr. Mason had previously had with Cecil Hickman about eight months prior to Mr. Mason's death. Mr. Hickman was the caretaker of the property belonging to Cartter [sic] Patten. On the day of that incident, Mr. Nixon and Mr. Mason were hunting on what they thought was property belonging to Mr. Ault. The two men had separated when Mr. Nixon ran into Mr. Hickman and his two sons, all of whom were armed. Mr. Hickman told Mr. Nixon to get off the property. Mr. Nixon told Mr. Hickman that he did not know where Mr. Mason was and then left to retrieve his ATV. Mr. Nixon heard Mr. Hickman yell that he had

-3-

spotted Mr. Mason in the woods, and then Mr. Hickman discharged his pistol three times in the air.

In a separate incident, Mr. Nixon and Mr. Mason spotted Mr. Hickman by the side of the road, and Mr. Mason swerved his car toward him. Mr. Hickman shook his pistol at the two men as they drove away. Mr. Nixon, however, denied that there were any hard feelings between the three men. On redirect, Mr. Nixon said that the first incident did not occur anywhere near Helican Road. Mr. Nixon said that Mr. Hickman was in Kentucky during the weekend of July 9, 1988.

Lee Griffith said that his brother, Kenneth Griffith, went up Signal Mountain on Saturday, July 9, around 3:00 p.m. Mr. Griffith later heard on a television newscast that his brother was missing, and he went over to the Masons' house. While he was at Mr. Mason's house, Mr. Griffith said that the police received a call that three ATVs had been discovered in an illegal dump on Roberts Mill Road. Mr. Griffith followed the police to the dump site and then started home to tell his mother the latest news. The engine of his truck died, however, on the way up Roberts Mill Road, and Mr. Griffith flagged down a Jeep Scrambler driven by Defendant. According to the photograph of Defendant's Jeep that was introduced at trial, the vehicle's front end resembled a standard Jeep Wrangler, and the rear was open like a pick-up truck. Defendant gave Mr. Griffith a ride back to Mr. Mason's house. Mr. Griffith stood behind Defendant as they drove, and he noticed that the wood slats in the Jeep's bed were wet. Mr. Griffith said that he thought that was odd at the time because it had not recently rained.

On Monday, Lee Griffith joined the search party on Helican Road. He said that the group took a rest break near the gate on Helican Road. A member of the team spotted some blood drops on a leaf near the gate. Helican Road was a dirt road, and Mr. Griffith said that the area around the gate was smooth so that they could not tell whether anyone had walked or driven an ATV through the gate. Mr. Griffith identified a knife found by one of the search team as belonging to his missing brother, Kenneth Griffith.

On cross-examination, Lee Griffith admitted that the police were not there when he first arrived at the dump site on Roberts Mill Road. After he got to the dump site, some people climbed up from the spot where the three ATVs lay.

Larry Sneed, a detective with the Hamilton County Sheriff's Department, responded to the call on July 10 that three ATVs had been found on Roberts Mill Road. The side of the hill leading to the dump site sloped down from the road at about a forty-five degree angle. A red, white and blue ATV was found approximately 200 feet below the road. One of the red ATVs was discovered about 150 feet down the hillside, and the second red ATV was found approximately 60 to 65 feet below the road. There was blood on both of the red ATVs which was later determined to be human blood. The blood on one of the red ATVs ran from the seat onto the tank which indicated that the ATV was parked when the injury causing the bleeding occurred. No blood was found on the red, white and blue ATV. Detective Sneed said that Defendant would have used Roberts Mill Road to get from his house to his campground on Helican Road.

Detective Sneed said that the ATVs were operable when they were tested. One of the red ATVs was running when it was pushed over the bluff because the ignition was in the "on" position, and the exhaust pipe had burned a section of the plastic fender. One ATV at a time could fit into the back of Defendant's Jeep, but it took two men to lift the ATV into the Jeep.

Detective Sneed said that they set up a command center on Monday, July 11, about three miles from the dump site on Roberts Mill Road. The police learned that shots had been heard on Saturday evening in the Helican Road area. Detective Sneed said that a search team walked from Vandergriff Road approximately 2.2 miles down Helican Road until they reached the gate. When the team stopped for a break, Detective Sneed noticed a spot of blood on a leaf. He also observed drag marks leading away from the road to the base of a tree. This spot was covered with insects, and they discovered blood and what appeared to be brain tissue in the vegetation surrounding the

area. Detective Sneed said that it looked like someone had swept the road around the gate with a broom.

At this point, a cadaver dog was unleashed. The dog started digging beneath the gate, and a large pool of blood was discovered. A second blood-stained area was later discovered. Both areas had been covered with leaves. The bark of a tree near the road showed either buckshot or shotgun blasts. The banks of Helican Road were about one to two feet high, and a section of the bank appeared to have been cut across by a vehicle's bumper or tailgate.

Defendant's campground was approximately eight-tenths of a mile from the gate on Helican Road. Detective Sneed said that Defendant's camp was very clean when they searched it. Pieces of a blue tarp were visible in the fire pit. Detective Sneed said that Defendant voluntarily gave him his logbook and his gun, which had been recently cleaned.

Detective Sneed said that the victims' bodies were found four days after they were killed in another illegal dump site on Big Fork Road in neighboring Marion County. Detective Sneed said that the site was approximately thirteen miles from the gate area on Helican Road and was accessible from Helican Road without driving off of Signal Mountain. The bodies rested on the ledge of a bluff approximately fifty to sixty feet below the road's surface. The bodies were stacked on top of each other about five or ten feet from the edge of the bluff and covered with brush and barbed wire. Detective Sneed said that the bodies were visible from the road.

On cross-examination, Detective Sneed said a warranty deed dated June 30, 1988, showed that Defendant owned approximately 130 acres around Helican Road which had been purchased from Cartter Patten. The property abutted the "blue hole," but Defendant did not own the pond. Detective Sneed said that he understood that Defendant had permission to use the property before title was actually transferred.

Detective Sneed said that he found a pistol wrapped in a towel in the tool box of one of the red ATVs but did not test the pistol to see whether it had been fired. Detective Sneed confirmed that there was only one drag mark leading from Helican Road into the woods. He said that they had not found any blood in the drag mark. None of the shotgun casings or waddings found in the area around the gate were fired with Defendant's gun.

Detective Sneed said that Defendant initially arrived at the command center on Roberts Mill Road in a neighbor's car. Detective Sneed drove Defendant back to the neighbor's house where his Jeep Scrambler was parked. Detective Sneed said that Defendant voluntarily let the police officers examine his vehicle, gun and log book. Detective Sneed said that the police did not do a gunpowder residue test on Defendant's clothes and were unable to retrieve any soil samples from Defendant's Jeep because it had been recently washed. No blood was found on the tarp remnants in Defendant's fireplace, and no test was run to determine if the material was actually from a tarp. Detective Sneed said, however, that the fragment of cloth contained a grommet and eyelet consistent with those generally found on a tarp. Detective Sneed did not notice a tarp when he later searched Defendant's garage. Detective Sneed conceded that no DNA tests were performed on the blood samples gathered from the Helican gate area and the ATVs, and the blood samples were subsequently destroyed. Detective Sneed said that one of the red ATVs weighed 410.1 pounds and the second red ATV weighed 363.8 pounds. The red, white and blue ATV weighed 291.1 pounds.

Frank King, the Hamilton County medical examiner, examined some of the bone fragments and tissue found at the Helican gate before the victims' bodies were discovered. He said that the bone chips were consistent with the bones in a human skull but could not identify the samples with one hundred percent accuracy. Dr. King said, however, that the bone chip had lead markings on the fractured edge which is typically found when a bullet strikes a bone. Dr. King could only determine that the tissue substance found at the scene was from either a human

-7-

or an animal. Dr. King said that the path of the blood down one of the ATVs was consistent with the victim sitting on the ATV when he was shot.

Dr. King said that Mr. Griffith died from a gunshot injury to the head. The bullet entered the left side of the victim's head just above and behind the left ear and exited the right side of the victim's head. Portions of the victim's skull were not found with the body. There was a slight downward trajectory from the entry to the exit wound consistent with the shooter standing and the victim sitting when the injury was inflicted. Mr. Griffith also had postmortem abrasions to the chest area consistent with the body being dragged over a rough area. Dr. King could not say whether the bone fragments found at the scene came from Mr. Griffith's skull. The victim would have lost consciousness immediately after the gunshot with death occurring within a few seconds to one or two minutes later.

Dr. King said that Mr. Mason died of a shotgun wound to the chest. The pellets entered the left side of his body and traveled in a downward trajectory toward the victim's back. The path of the pellets was consistent with the shooter standing and the victim sitting when the gun was fired. Shotgun pellets were found in the back of Mr. Mason's right chest and shoulder. The shotgun pellets entered the victim's body relatively close together indicating that the victim was shot at close range. The large wound would have bled considerably. Dr. King said that the gunshot wound was fatal, but the victim would not have lost consciousness for a minute or two.

Mr. Smock suffered two shotgun wounds. The first wound, unlike Mr. Mason's and Mr. Griffith's, was caused by small pellets, or "birdshot." The pellets entered Mr. Smock's right shoulder and upper chest and traveled in a straight line. Two pieces of shotgun wadding were found in the wound indicating that the shotgun was fired at close range. The second wound was in Mr. Smock's lower left shoulder. The pellets were larger than those found in the first wound and traveled upward and to the right. Dr. King said the wound was consistent with

the shooter standing over the victim when he fired the shotgun the second time.

On cross-examination, Dr. King said that he could not tell what type of gun was used. He also conceded that Mr. Smock could have been shot by two different people or two different guns. Dr. King confirmed that all three men weighed over two hundred pounds at the time of their death.

Kelly Fite, a firearms examiner with the Georgia Bureau of Investigation, examined Defendant's 12-gauge, pump-action shotgun on July 23, 1988. Mr. Fite said that Defendant's gun held seven rounds of ammunition and was capable of firing seven shots in a row. The interior of Defendant's gun, however, had no imperfections which would mark the wadding. The wadding found at the Helican gate also had no markings. On cross-examination, Mr. Fite said that he fired Defendant's gun ten times, and there were no marks on the wadding to distinguish one test from the other.

Vincent Dale Brown lived on Roberts Mill Road at the time of the incident. On July 9, 1988, he was helping a friend move off of Signal Mountain between 11:00 a.m. and 1:00 p.m. When Roberts Mill Road narrowed to one lane, Mr. Brown jumped out to stop traffic so the truck could get down the mountain. One of the vehicles he stopped belonged to Defendant. Defendant's Jeep was covered with mud. Defendant told Mr. Brown he and his wife were going up to his property to camp. Mr. Brown said he went back to Signal Mountain after the move was finished. Mr. Brown was standing in a friend's yard on Hixon Road between 6:00 p.m and 8:00 p.m, when he heard six or seven shots from the direction of Helican Road. A trail off of Hixon Road led to the gate area on Helican Road.

Mr. Brown said that he had heard that someone had bought the property leading up to the "blue hole." There were "no trespassing" signs on the road, but he did not pay any attention to them. One day, when he started down Helican Road, Defendant approached him, carrying a shotgun. Defendant appeared angry. Mr. Brown said that Defendant calmed down

when he recognized Mr. Brown as the cousin of the man who worked on his Jeep. Mr. Brown followed Defendant to his camp site where Defendant recorded his name in a log book. Mr. Brown said he noticed a blue tarp at Defendant's campsite. On cross-examination, Mr. Brown said that Defendant told him he could hunt on the property if he called first. Mr. Brown did not remember whether or not he testified about the blue tarp during Defendant's first trial.

Pam O'Neal was camping on her property near Jake's Campground on July 9, 1988. Around dinner time, she heard the sound of more than one ATV traveling on her property. Later that evening, she heard five or six gunshots. Ms. O'Neal left her property around 2:00 a.m. As she drove home, Ms. O'Neal noticed a Jeep Scrambler coming from the area of Taft Road on Carroll Road.

William Wiggins lived near Boston Branch Lake on Signal Mountain. Mr. Wiggins said that around 7:00 p.m. or 7:30 p.m. on July 9, 1988, he heard a rapid series of five to eight shots coming from the direction of Helican Road. On cross-examination, Mr. Wiggins agreed that, on previous occasions, he had heard shots from that direction during hunting season. Mr. Wiggins said that he had never been on Helican Road.

Donna Anderson testified that she and her boyfriend were on Signal Mountain during the early morning hours of July 10, 1988, looking for her boyfriend's son who was supposed to be camping. They were driving down Roberts Mill Road between 12:30 a.m. and 1:00 a.m. when Ms. Anderson saw a Jeep coming in the opposite direction. Because Roberts Mill Road narrowed down to one lane at that point, Ms. Anderson and her boyfriend pulled over and stopped. The Jeep's driver got out of the Jeep for a minute and then got back in and drove up the road. When he was even with Ms. Anderson's vehicle, the Jeep's driver looked at her and said "sorry about that." Ms. Anderson said there was a cover over the back of the Jeep, and the Jeep's rear end was riding close to the ground. Ms. Anderson identified

Defendant's son, Donnie Casteel, as the driver of the Jeep during a photographic lineup.

On cross-examination, Ms. Anderson said that the Jeep's headlights were not shining in her face but were shining upward. The windows on both vehicles were rolled down, and Ms. Anderson leaned forward so she could see the other driver's face. Ms. Anderson admitted that she initially described the Jeep as a "regular" Jeep to the police. She denied that she said the Jeep had a rag top in her original statement. Ms. Anderson said she meant that there was a canvas pulled across the Jeep's bed.

Janice Hall spent July 9, 1988 with a friend who lived on Sawyer Road near Roberts Mill Road. Ms. Hall testified that she was awakened in the early morning hours of July 10 by the sound of a vehicle's tires on the road. Ms. Hall said that the vehicle made three or four trips back and forth on the road with approximately twenty minutes between trips. On cross-examination, Ms. Hall admitted that Defendant's Jeep drove past her friend's house the next morning, and that she did not particularly notice any sound made by the Jeep's tires as it passed. Ms. Hall said that a woman was driving the Jeep on Sunday morning.

Herschel Green's testimony from Defendant's first trial was read in the record. Mr. Green said that he was on his front porch around 5:00 a.m. on July 10, 1988, drinking coffee. Mr. Green said that he heard Defendant's Jeep go by. Mr. Green admitted that he could not see the Jeep from his porch.

The State recalled Mr. Brown as a witness. Mr. Brown testified that he warned Defendant that people would not like it if he closed Helican Road so that people could not swim at the "blue hole." Mr. Brown said that Defendant replied that he could take care of the trespassers.

James Walling testified that he was driving to work on Roberts Mill Road around 6:00 a.m. on July 10, 1988. He saw Defendant's Jeep coming up the mountain above the dump site.

Although it was dark in the woods at this time of the morning, Defendant did not have his headlights on.

John Lines was Chief of the Walden Rescue Unit at the time of the killings. On Sunday, July 10, 1988, he was driving to the fire hall on Taft Highway on Signal Mountain when he stopped to wash his car. A woman was in the next stall washing a Jeep. Mr. Lines noticed the vehicle because he saw blood in the back of the Jeep when he drove in. The woman told Mr. Lines that she had taken a pig to the slaughterhouse. Mr. Lines received a call about the three missing men while he was at the carwash. He jotted down the license tag number of the Jeep on a piece of paper. Mr. Lines said that he saw Defendant driving a Jeep with the same license tag number two days later. Mr. Lines said that he lost the piece of paper with the Jeep's license tag number.

On cross-examination, Mr. Lines said that his conversation with the woman driving the Jeep lasted approximately twenty seconds, but admitted that he could not identify either her or Defendant from photographs during the first trial. Mr. Lines denied that he did not mention seeing the woman at the car wash until Defendant's second trial. Mr. Lines believed that he told several officers about the incident. Mr. Lines admitted that he first said that the vehicle at the car wash was a pick-up truck, but he was now positive that the vehicle was a Jeep Scrambler. He admitted that he said during Defendant's first trial that he saw the vehicle again on Monday, not Tuesday.

Terry Mills and Jeff Mann went to the "blue hole" on Saturday afternoon, July 9, 1988. Mr. Mills said that Helican Road was frequently traveled by people who were going swimming at the "blue hole." Mr. Mann said he had been going to the swimming hole since he was ten or eleven. Mr. Mann said that he thought that Helican Road was a public road.

Mr. Mills described Helican Road as a dirt road crossed by streams and filled with mud holes that only a four-wheel drive vehicle or an ATV could navigate. Mr. Mills said that

when he was on the road on July 9, he and his friend had to remove some barbed wire that was strung across the gate on Helican Road and some branches which lay across the road. Mr. Mills said that he drove through the gate. When he reached the TVA power lines that lay beyond the gate between 3:00 p.m. and 3:30 p.m, Defendant walked up to his truck. Defendant's face was red, and he appeared angry. Defendant held up his shotgun and told the two men not to come any closer. Mr. Mills got out of his vehicle and held his arms in the air to show Defendant he was not armed. Defendant told them he was going to keep people off his property, "no matter what [he had] to do." Both men said they were scared. Defendant made them sign their names, a description of the vehicle, and the vehicle's license tag number in a log book. Mr. Mills and Mr. Mann were the last people to sign Defendant's book.

Mr. Mills said that Defendant had a small camp under the power lines with a makeshift tent made from a tarp, some chairs, a table and a lantern. A Jeep Scrambler was parked at the campsite. Mr. Mills denied that he told the police that he did not know whether or not there was a tarp at the campsite. Mr. Mann admitted that Defendant never actually pointed his shotgun directly at them.

Portia McDowell and her husband owned a nursery on Big Fork Road. Ms. McDowell took daily walks down the road which led past the illegal dump site. On Friday, July 8, 1988, Ms. McDowell walked past the dump site and did not notice anything unusual. On Monday, July 11, 1988, she noticed a foul odor emanating from the dump and a lot of insects swarming the area. Ms. McDowell said that the dump site appeared to have been swept, and the trash had been moved to one big pile.

Mark Sively owned property on Sively Trail. Helican Road was approximately one hundred yards from the back of his property. Mr. Sively found Mr. Griffith's knife in the middle of Helican Road during the search on Monday, July 11, 1988. Mr. Sively said that he and Defendant discussed Defendant closing Helican Road to the public on the Saturday before the killings. Defendant showed Mr. Sively his log book at that time and told

him as long as he had his gun, Defendant would not have any trouble.

Defendant also stopped David Mosteller and Derek Belk on Helican Road when they attempted to drive to the "blue hole" in June. Defendant rested his shotgun against the truck's door frame and told the two men if they did not leave, he would shoot. Defendant recorded their names in his log book and allowed them to turn around at Defendant's campsite. Mr. Belk said that he noticed a tent made from a blue or green tarp at the campsite but conceded that he did not mention the tarp at Defendant's first trial.

On June 11, 1988, Defendant stopped Delores Kennedy and Michael Killingsworth after they had driven through the gate on Helican Road. Defendant cocked his shotgun and stuck it through the truck's window, with the barrel pointed at the dashboard. Defendant told them they were in trouble for trespassing. Defendant allowed the couple to leave after recording their names in the log book.

Judith and Milton Lowery, along with their children and some other friends, were swimming in the "blue hole" on June 18, 1988 when Defendant appeared at the pond with a 12-gauge shotgun. He told Ms. Lowery to tell the men to come down from the cliffs. When her husband came down to the pond area, Defendant stuck the gun in Mr. Lowery's face and told him he was lucky there were women and children present. Ms. Lowery said Defendant's finger was on the trigger of his gun, and the gun was pointed toward her husband. Ms. Lowery said that Defendant marched the family up the hill, women and children first, followed by the men. Defendant walked behind the group with his gun pointed at Mr. Lowery's back.

James Perry, Gary McDowell, Jonathan Ewton, Michael Dantzler, and Paul Meeks had similar encounters with Defendant between April 1988 and July 1, 1988. All of them testified that Defendant appeared suddenly as they drove up to the gate on Helican Road and demanded that they leave. Defendant was armed during the encounters and appeared angry.

-14-

Defendant told Mr. McDowell that he was having trouble with trespassers and specifically mentioned Richard Mason's name.

On the other hand, Defendant permitted Steve Craig and his friends to swim at the "blue hole" because they volunteered to pick up trash around the site. Mr. Craig said he later called Defendant and made a second date to return to the swimming hole on July 7, 1988. He and his friends spent the day swimming without incident. Defendant told Mr. Craig that he did not have as much trouble with the pick-up trucks because the drivers usually turned around when they saw the "no trespassing" signs. Mr. Craig said that Defendant said it was the four-wheelers that were a problem and that he was going to kill one of them one day. Defendant became angry when he talked about the ATVs that used Helican Road. Mr. Craig said that Defendant was carrying a gun when he met him.

Sharon Marie Hill began dating Defendant in August 1996, even though she knew Defendant was married. Ms. Hill said she had heard about the killings but did not know Defendant's connection with the incident. In September 1996, Ms. Hill received an anonymous letter with newspaper clippings about the murders. Defendant told her to ignore the letter and said that other people had received similar letters. In a second letter, the writer said that "[w]e were up there camping, and these men came up on the three-wheelers and he shot them because they were disturbing him, and he sent me home." The letter was signed "Boozie." Defendant told her the letter was "bogus." A third letter was sent to Ms. Hill's neighbors informing them that Ms. Hill was dating a murderer and putting their lives in danger. The first and third letters were unsigned. Ms. Hill gave Defendant the correspondence.

Ms. Hill agreed to assist the police in their investigation after she received the second letter. Susie Casteel, Defendant's wife, came over to Ms. Hill's house around 2:30 a.m. the next morning while Defendant was visiting. During a taped five-hour conversation, Ms. Casteel said to Defendant that she was "drug down to the police station and fingerprinted because of what you

[had] done." Ms. Hill said that Defendant did not respond to Ms. Casteel's comment.

Later that day, Defendant returned to Ms. Hill's house, and Ms. Hill asked him to return the letters about the murders. Defendant initially gave her the letters, but while Ms. Hill was momentarily out of the room, Defendant substituted a blank piece of paper for the letter signed "Boozie." When Ms. Hill later confronted Defendant about the substitution, Defendant admitted that he had burned the letter because it "could be harmful to him." Ms. Hill later found out that Ms. Casteel's nickname was "Boozie."

Ms. Casteel testified on Defendant's behalf. She said that she was still married to Defendant at the time of his second trial. The Casteels first considered purchasing the Patten property in March 1988. Mr. Patten told them they could use the property until the purchase was completed in June 1988. Ms. Casteel said that she and Defendant went to the campsite on the property frequently during this period of time. They put up "no trespassing" signs with their telephone number, and began to stop people traveling Helican Road to tell them the land was privately owned. The sheriff's department suggested they keep a record of everyone who tried to pass through the gate on Helican Road so that they could swear out an arrest warrant if necessary. Ms. Casteel said that she never saw Defendant point a gun at anyone.

The Casteels' wedding anniversary was July 9, 1988. Ms. Casteel said that she and her husband planned to spend the weekend camping on their property. After they arrived at the camp site near the TVA power lines, Ms. Casteel went swimming in the "blue hole," and she and Defendant later cooked some hot dogs. Ms. Casteel said that she did not hear any gunshots that night but said that the noise of the rushing creek near the pond was loud. She and Defendant left the swimming hole after it was dark and returned to the campsite.

Ms. Casteel said that she had received a blue tarp that day as an anniversary present and denied burning the tarp in the fire

pit. Ms. Casteel said that the tarp was in their garage when the police later searched her home.

The Casteels' collie got sick during the night. Early the next morning, July 10, 1988, Ms. Casteel and Defendant left the campsite to take the dog home. They had to turn around, however, because Ms. Casteel had left her pocketbook at the campsite. Ms. Casteel dropped Defendant off at the beginning of Helican Road and then drove home to attend to the dog. Ms. Casteel said that she gave the dog some medicine and headed back to Signal Mountain in about fifteen to twenty minutes. Ms. Casteel said that she did not wash the Jeep that morning.

Ms. Casteel's brother and sister-in-law, Ronnie and Brenda Lewis, were at the campsite when Ms. Casteel returned around 9:00 a.m. to 9:30 a.m. The two couples left the property between 1:00 p.m. and 2:00 p.m. Defendant returned to the swimming hole later that afternoon with his daughter and her friend while Ms. Casteel stayed in town. Ms. Casteel said that her son, Donnie, spent the entire weekend with his grandparents.

Ms. Casteel said that she wrote the letters to Ms. Hill because she was upset and angry over Ms. Hill's relationship with Defendant. Ms. Casteel said that she wanted to scare Ms. Hill so that she would break up with Defendant. Ms. Casteel said that when she told Defendant she was upset about being fingerprinted, she just meant that she was upset over the investigation in general and people's reaction to the killings. Ms. Casteel said that Defendant did not kill the three men, and she did not see or hear anything on either July 9 or July 10, 1988.

On cross-examination, Ms. Casteel admitted that she had sent the three letters to Ms. Hill. Ms. Casteel reiterated that she just wanted to scare Ms. Hill and said that she did not even know the police had her letters until after Defendant was arrested. She admitted that she did not tell the police why she wrote the letters. Ms. Casteel said that Defendant was at the camp site with her brother and sister-in-law when she returned. Ms. Casteel admitted that the Jeep was equipped with a winch for towing but explained that the winch was located in the front

of the vehicle and that the Jeep would be damaged if the winch was used to tow something behind the vehicle.

Donnie Casteel testified that he worked from 2:30 p.m. to 11:30 p.m. on July 9, 1988. He went to his grandparent's house after he got off work and slept until about 10:30 the next morning. Donnie Casteel's [grandparents'] confirmed that he was at their home on July 9 and July 10, 1988.

Ronnie Lewis said he arrived at Defendant's campsite on July 10, 1988, around 8:45 a.m. but found it deserted. Mr. Lewis said that the only thing different about the property on this visit was the barbed wire that was strung across the gate. Mr. Lewis said that there was a tarp pulled across a wire between two trees at the camp site. Defendant arrived at the camp about five minutes after Mr. Lewis and his wife. Defendant told Mr. Lewis that he had been up all night with his dog, and Mr. Lewis said that Defendant looked fatigued. Ms. Casteel arrived about forty-five minutes later. Mr. Lewis said that he did not see any blood on Defendant or anywhere in the camp.

On cross-examination, Mr. Lewis conceded that he noticed a few odd things about the camp when he first arrived. Defendant had left his shotgun leaning against a tree, a fire was smoldering in the fire pit, there was one walkie talkie in the camp, and no vehicles. Mr. Lewis said that he did not see Defendant on Helican Road when he drove in even though Defendant approached the camp from that direction. Mr. Lewis said that Defendant was out-of-breath as if he had been running, and Mr. Lewis assumed Defendant had tried to catch up with him. Mr. Lewis did not remember seeing a pocketbook at the camp site. Mr. Lewis said that Ms. Casteel did not enter the camp from Helican Road but approached the camp from a point above the power lines which was a longer route. Mr. Lewis said that Ms. Casteel appeared frustrated.

Raymond Harden testified that he lived at the bottom of Roberts Mill Road. On July 9, 1988, Mr. Harden was returning home around 7:30 p.m. A car was blocking the road at the top of the hill, and Mr. Harden had to ask Sandy Smith to move her

car so he could pass. As he passed the dump site, Mr. Harden saw a black pick-up truck backed up to the dump. One of the Hickman brothers was standing in the back of the truck, and the other brother was standing next to the truck. Mr. Harden said the Hickmans were pushing two red ATVs out of the back of the truck. The vehicles had blood on the seat and gas tank. Mr. Harden asked them what they were doing, and one of the brothers told him he needed to leave, so Mr. Harden left. Mr. Harden said that he never told anyone this story because he was afraid the Hickman brothers would harm his wife and children.

On cross-examination, Mr. Harden admitted that he never saw either one of the Hickman brothers after July 9, 1988.

State v. Frankie E. Casteel, No. E2003-01563-CCA-R3-CD, Hamilton County, slip op. at 1-12 (Tenn. Crim. App. Sept. 24, 2004), app. denied (Tenn. Dec. 28, 2004).

At the post-conviction hearing, the Petitioner testified that he suffered a back injury in 1977 or 1978 and was limited to lifting no more than fifty pounds. He said that he was first interviewed by the authorities, without the benefit of Miranda warnings, on July 11 or 12, 1988. He said he assumed from the tenor of the questioning that he was a suspect. He said he was not told his privacy rights extended to his gun or his Jeep. He said he did not recall defense counsel ever filing a motion to suppress the tape of his interview or the items taken from him. He said that counsel never requested that bond be set, despite the twenty to twenty-two months he was in jail between the appellate court's remand of his case for a new trial and the completion of the second trial. He said that during his second trial, he was restrained by a leg brace that was visible to the jury and that two officers were stationed at his sides. He said that due to the close stationing of the officers, he was unable to have discussions with his attorney.

The Petitioner testified that he did not think counsel adequately impeached the State's witnesses relative to differences in their testimony at the first and second trials. He also complained in general terms that counsel did not give him all of the evidence used in the first trial, failed to file a discovery motion, and failed to object to the search of his Georgia home and to the seizure of property that was not covered by a warrant. He said he did not recall counsel questioning witnesses about being armed when on the Petitioner's property. He said that counsel never questioned the witnesses about the reputation of one of the victims, Richard Mason, and that counsel told him he did not want to be perceived as attacking the victims or their families. He said that despite some indication one of the victims may have had a high-powered handgun, there was no evidence of this presented at trial. He said that

despite his lack of a criminal record, counsel advised him that there was "no need" for his testimony, that the defense could be shown in other ways, and that it was the State's burden to prove its case. He complained that counsel failed to order a video transcript, which he said was necessary because there were physical actions and projected exhibits which were not adequately conveyed by the record.

The Petitioner testified that although witnesses testified that he stopped them outside his property near a gate, this testimony was false. He said he believed these witnesses were coached and that counsel failed to question them adequately about whether they had been coached. He also complained that counsel failed to request that the jury view the Helican Road area and stated his belief that the evidence at trial did not adequately represent the area and was misleading. He said the State characterized the road as a public access road, but the Tennessee Valley Authority (TVA) characterized it as "an eight-foot jeep track" that was rutted and rocky. He said that neither the prosecutor nor his attorney did a good job of accurately eliciting evidence about the distances and property boundaries of the area. He said he thought the State deliberately obscured distinctions between two locations. He said that although there was evidence he fired a .357 handgun, he had never done so, and that defense counsel did not challenge the evidence. He said two shotguns were seized by the authorities, one of which was never returned.

The Petitioner testified that when he surrendered his Jeep to Officer Sneed, it was not muddy. He said, however, a photograph of the Jeep in a muddy condition was entered at trial and that counsel did not object to it. He also complained that there was a photograph of the Jeep next to an ATV with a flat tire to which counsel failed to object. He acknowledged that the flat tire was not obvious in the photograph. The Petitioner also complained that counsel failed to challenge the testimony of witnesses Kennedy and Killingsworth that they had to back their vehicles out of the Petitioner's property because the Petitioner would not allow them to turn around. The Petitioner said the witnesses' statements would have shown that there was an area where they could turn around. He also complained that although Janice Hall testified in the first trial that she saw a Jeep with a collie in it and heard loud tire sounds all night that were not from the Petitioner's Jeep, defense counsel did not gain the full value of this exculpatory evidence in the second trial because he did not elicit the information about the dog.

The Petitioner testified that in his opinion, counsel failed to offer a defense theory in his opening statement. He said defense counsel supported the State's theory by conceding that human remains were collected by the authorities. He said he did not recall counsel's saying anything about the State having destroyed evidence.

The Petitioner testified that counsel failed to request expert assistance to counter incorrect testimony given by the State's firearms and ballistics witness or to counter the State's theory that the Petitioner would have heard shots fired if present at the scene. He also complained that counsel failed to challenge the State's reliance on the testimony of Mr. Wiggins as being very experienced with shotguns. He said that counsel failed to request a jury instruction that physical presence did not equate with guilt.

The Petitioner testified that he was dissatisfied with counsel's appellate advocacy. He stated his belief that counsel should have challenged the proof in the record that there was human tissue and bone found at the crime scene. He said that the State's appellate brief stated that Mills and Mann entered his property on ATVs, and he claimed that this assertion was untrue and misleading. He said the State's brief also unfairly characterized the "blue hole" as being public domain and him as trying to take over the "blue hole." He complained, as well, that the State's brief represented that waddings connected with his shotgun were found at the Helican gate, even though no waddings found at that location were tested. The Petitioner said that counsel failed to notice that the State's brief erroneously represented Donna Anderson's testimony about the location where she observed relevant facts.

The Petitioner testified that counsel did not raise an issue regarding improper closing argument at trial or on appeal.

The Petitioner testified that he raised additional issues in his pro se petition. He stated that he did not want to waive any of those issues. He specified the following additional issues:

> (1)     That Wiggins' initial report to the authorities that he "was not real positive of the shots' directions" had not been fully explored;
>
> (2)     A detective supplied the words "blue hole" and "power line" to Wiggins, which was not explored at trial;
>
> (3)     Defense counsel failed to call an expert to testify about sound shadow and other sound phenomena;
>
> (4)     In his opening statement, defense counsel stated that "human tissue was recovered from the area where the [victims] were killed" although this statement supporting the State's theory would not be supported by the proof;

-21-

(5)     The State failed to preserve and test evidence to show whether any bone or substance was human, despite the fact this would have provided exculpatory evidence to the Petitioner;

(6)     Trial counsel failed to present "vital proof" to the jury consisting of Lines's previous sworn testimony and information from a legible copy of Walling's statement;

(7)     Trial counsel failed to decline appointment to the Petitioner's case despite the fact he had a conflict of interests because he worked with the special prosecutor, Mr. Davis, as co-counsel on a murder case against a defendant named Billings during the proceedings against the Petitioner;

(8)     Trial counsel failed to bring the matter before the court when the Petitioner was released from the Department of Correction on a "no holds" status, only to be held at the county jail on a detective's authorization;

(9)     Counsel failed to address the prejudicial effect of the Petitioner being shackled and guards standing on either side of him in front of the jury despite the fact the Petitioner had not engaged in any "indication of untoward action";

(10)    Trial counsel failed to request a jury viewing of the area in issue;

(11)    The State presented false and intentionally ambiguous evidence about the distances and locations involved, including that Killingsworth and Kennedy trespassed on the Petitioner's property at an area referred to as "the gate," despite the fact these individuals admitted they were at "the power line opening," which was eight tenths of a mile away;

(12)    Counsel failed to object to the State's actions with respect to the location of the Killingsworth and Kennedy trespass;

(13)  Counsel did not protect the Petitioner's rights by objecting to the news media having cameras and sound recording devices in the courtroom;

(14)  Counsel failed to ensure enforcement of the rule of sequestration of witnesses from the courtroom and from each other;

(15)  Counsel failed to insist that the State's "assisting witness" testify first;

(16)  Counsel failed to rebut witness Green's claim of recognizing the sound of the Petitioner's four-cylinder Scout, despite the fact that the Petitioner had no such vehicle and at least one witness for the State did;

(17)  Counsel failed to request a video transcript in order to preserve in the record the visual materials and physical indications presented to the jury;

(18)  Counsel failed to challenge the general nature and validity of the search warrant and attendant search of the Petitioner's Georgia home and the failure of law enforcement to return seized items to the Petitioner;

(19)  Counsel failed to bring forward evidence that the weapons brought onto the Petitioner's property were powerful firearms and not recreational in nature;

(20)  Counsel failed to correct or refute Gary McDowell's testimony that "the [Petitioner's] campsite was right at the post," which led to the jury incorrectly perceiving that the killings took place near a gate, when the witness was referring to a power line tower;

(21)  Neither counsel nor the State adequately informed the jury that mere presence at the time the crimes were committed did not constitute guilt of the offenses;

-23-

(22)     Counsel failed to insist on a jury from a similar geographic area and instead agreed with the State on jurors from another locale that did not share geographic or lifestyle characteristics with the venue;

(23)     Counsel failed to challenge the site of jury selection;

(24)     Counsel failed to raise an issue seeking to require the State to comply with all laws regarding wiretapping, surveillance, and mail opening;

(25)     Counsel failed to present proof that a detective suggested answers to O'Neal about the Petitioner's Jeep and to Mills and Mann about a gun;

(26)     Counsel failed to challenge the admission through witness Hill of letters allegedly received by neighbors;

(27)     Counsel failed to give a "clear synopsis of multiple shots," which would have supported a self-defense theory involving an exchange of gunfire, despite the fact the Petitioner denied such action;

(28)     Counsel failed to challenge Sneed's claim that the integrity of a secured area of the crime scene was preserved by using the police report to demonstrate that there were wheel tracks and boot prints in the area, and he failed to require production of photographs taken of this area;

(29)     Counsel failed to present evidence that a jug of blood brought to the crime scene by a dog handler was spilled at the gate;

(30)     Counsel failed to challenge the appellate court's characterization of the facts about the testimony of Nixon;

(31)     Counsel failed to challenge the State's characterization of Helican Road as a public right-of-way, rather than a private trail owned by the Petitioner;

(32)  The State failed to preserve "debris evidence," and counsel failed to have the evidence preserved and tested;

(33)  Counsel failed to object to the State's characterization of the Petitioner as acting aggressively toward persons driving ATVs;

(34)  The State misstated facts to the appellate court that Mills and Mann drove away on ATVs, rather than trucks that could haul both ATVs and bodies and that Kennedy and her companions were approaching the gate when pertinent events occurred;

(35)  Counsel failed to rebut the State's characterization of the Petitioner's physical condition through a "caving log" last dated 1980;

(36)  Counsel failed to challenge the State's failure to prove venue;

(37)  Counsel failed to raise an issue relative to a television station having aired a documentary-type program implicating the Petitioner in the crimes, which tainted the jury pool;

(38)  The court allowed constructive amendment of the indictment by requiring the Petitioner "to answer charges which had not been presented by a grand jury," and the indictment contained a fatal variance because it alleged crimes which took place at a different location than demonstrated by the State's proof;

(39)  The investigation of the crimes was inadequate and geared toward proving the Petitioner as the perpetrator;

(40)  The State made improper closing argument that was unsupported with the proof, by presenting evidence in a misleading manner to support its theory, and by presenting evidence in the second trial that was at odds with the evidence in the first trial;

(41)   Counsel failed to discover and use photographs which would have shown the condition of the crime scene.

On cross-examination, the Petitioner acknowledged that he had extensive discussions with counsel and wrote him "copious letters." The Petitioner stated that he testified at his first trial and that had he testified at the second trial, his testimony would have been consistent with the testimony he gave at the first trial. He said that he wanted to testify at the second trial but that he did not do so on counsel's advice.

Trial counsel testified that he represented the Petitioner at the second trial. He said he did not request an expert witness to rebut Georgia Bureau of Investigation (GBI) Agent Fite's testimony because Agent Fite's testimony was inconclusive at best. He said Agent Fite was not able to testify that the shotgun he examined was used to kill the victims. He acknowledged that it did not occur to him to ask TBI Agent Best at the second trial why the agent sent forensic evidence for testing with the GBI, rather than the TBI. Trial counsel testified that he did not think the testimony of the State's witness Wiggins, who testified about having heard shots, was in the nature of expert testimony. He said he did not challenge Agent Fite's qualifications as an expert because he believed the witness was qualified.

Counsel acknowledged that he did not retain an acoustics engineer to challenge the testimony of the witnesses who said they heard shots or to show that someone at the "blue hole" could not have heard shots because the State conceded this point through its own evidence. He said he did, however, investigate these witnesses. He said that the defense conducted its own experiment, in which a person in the "blue hole" was able to hear a shotgun fired from the campsite to the gate. He said that in light of the results of the defense experiment, presenting a defense expert was inviting the expert to contradict the State's proof.

Upon questioning by the court, counsel testified that in preparation for the post-conviction hearing, he reviewed the transcript of the second trial but not the first. He said his performance was challenged only with respect to the second trial. The court admonished counsel not to be "flip" in his testimony. Counsel stated that he wore a hearing aid and had been having difficulty hearing post-conviction counsel's questions.

Trial counsel then testified that he did not have the five shotgun shells found near the gate and sent to Agent Fite admitted as evidence at the second trial. He said that the State's expert was unable to match the shells to the Petitioner's gun and that he considered this to be innocuous evidence. He said that before the second trial, he reviewed the former testimony of TBI Agent Margaret Bash and may have spoken with her in person or by phone regarding soil and blood evidence. He said that based upon his investigation, he had no

-26-

reason to believe she would have testified differently at the second trial and did not call her as a witness. He acknowledged that her test results were submitted by stipulation at the second trial and that the results revealed the blood to be human.

Counsel testified that he was aware when he was preparing for the second trial that Roy Parham was unavailable as a State's witness. He said he paid careful attention to whether there was any evidence that was admissible solely through Parham in order to challenge the evidence if an issue arose. He said, however, that another witness had firsthand knowledge of all such evidence. He said that when a witness is vague, he would object only if it made a "big difference."

Counsel testified that his cross-examination of Mr. Cox made Cox's testimony about guns less credible. He said that he did not ask Mr. Fite about his testimony given the lack of shotgun shells to test because Fite's testimony was about wadding, not shells, and there were no shotgun shells to test.

Counsel testified that he developed evidence at trial that either two or four "stout officers" had to lift one of the three-wheelers onto the Jeep to remove it from where it was found. He said the tires also had to be deflated but that when the three-wheeler was discovered off the side of a road, its tires were inflated. He said this evidence was a crucial part of the defense strategy.

Counsel testified that he did not recall evidence being introduced about a "drug party" taking place at the crime scene. He said, however, he investigated this information.

Counsel testified that he did not elicit testimony from Janice Hall about hearing "loud tires all night" and seeing a woman driving a Jeep with a Collie in the back because he did not think this was exculpatory. He said he considered this evidence inculpatory because the Petitioner's wife testified that she took the Collie home during the night.

Counsel testified that Mr. Lines was the least credible witness he had ever encountered. He said that Mr. Lines said the woman he saw at a car wash was not the same person as the Petitioner's wife, to whom Mr. Lines had pointed at trial. He said Mr. Lines had been involved in the search of the area and that he thought Lines "was some guy [who] was just looking for his 15 minutes of fame[.]" He said he was able to demonstrate that Lines testified differently in the second trial about a date Lines claimed to have been in a certain location than he had in the first trial. He said that he raised an issue about Mr. Lines's testimony in the second trial.

Trial counsel also testified that at the second trial, he had a trial notebook which contained some of the State's witnesses' statements to law enforcement and their testimony from the first trial. He said the prosecutor allowed him to be present when the prosecutor prepared these witnesses for trial, and he had his notes from that, as well. He said he was able to cross-examine Mr. Dantzler at the second trial about his testimony that the Petitioner pointed a gun at him a month after the crimes by demonstrating that Mr. Dantzler had not mentioned a gun being pointed at him when he gave an earlier statement or in his testimony at the first trial. He said he also used the information in his trial notebook to impeach Mr. Lines.

Counsel testified that despite the Petitioner's contention in the petition that counsel did not introduce evidence in the second trial that Ms. Hill believed the Petitioner did not commit the crimes, he presented this proof. He said that she testified that she accepted his explanation and that she probably would not have continued dating him had she believed he was a triple murderer. He said the appellate court had ruled that the Petitioner's failure to respond to the Petitioner's wife's statement, "I've had myself drug down to the police station and fingerprinted for what you've done," was an adoptive admission. Therefore, it was necessary for the jury to know that Ms. Hill and the Petitioner were having an affair in order for the defense to demonstrate that the Petitioner failed to respond at a time when he was being accused of adultery, not when he was being accused of murder. He said the appellate court had also ruled that letters that called the Petitioner a "murderer," which the Petitioner's wife wrote, were admissible and that the defense strategy was to demonstrate that the Petitioner's wife wrote the letters to scare Ms. Hill away from her husband, rather than because the Petitioner was actually a murderer. He said he did not request a limiting instruction because no legal basis for one existed.

Counsel testified that the defense was that the Petitioner did not commit the crimes. He said that he focused on "pok[ing] as many holes as we could and call[ing] into question as much of the State's evidence [as] pointed guilt to [the Petitioner]." He said that despite the appellate court's having ruled that some alternative perpetrator evidence was not admissible, he was able to develop new evidence for the second trial.

Counsel testified that he did not question the numerous witnesses who testified about being confronted by the Petitioner when they were trespassers on his property about their status as trespassers as a means to impeach their credibility. He said that many of these witnesses "were damagingly credible" and testified "like they were feeling the fright that they had at the time[.]" He said he did not ask them about being trespassers because the State's theory was that the Petitioner killed the victims because they were trespassing. He said that he thought the best course was to approach cross-examination of these witnesses carefully and that he attempted to cross-examine the witnesses to the extent that he thought their

testimony was inconsistent with any earlier statements or if he thought they were embellishing about their encounters with the Petitioner.

When asked why he repeated the State's forecast of its evidence in his opening statement, trial counsel testified that he knew how the State's witnesses would testify. He said his strategy was to emphasize throughout the trial and in closing argument that even with the thorough investigation, the State had no direct evidence that inculpated the Petitioner.

Counsel testified that he did not request a jury instruction that physical presence did not equate with guilt. He said that the defense theory was that the Petitioner was two miles away from the crime scene.

Counsel testified that he did not advise the Petitioner that he should or should not testify at the second trial. He said he was prepared to discuss the matter with the Petitioner, although he did not because the Petitioner was adamant he did not want to testify again. He said that had the Petitioner wanted to testify, he would have cooperated, although he would have advised the Petitioner that he did not think doing so was in the Petitioner's best interests. Counsel said the Petitioner's desire not to testify relieved him because he believed the Petitioner's testimony at the first trial was "awful." He said he spoke with the Petitioner's lead attorney from the first trial, who advised him that counsel from the first trial had been opposed to the Petitioner's taking the stand. He cited as an example of the Petitioner's poor testimony at the first trial that the Petitioner had denied confronting the many witnesses who testified he did so when they were trespassing on his property.

Trial counsel testified that he did not think having the Petitioner's wife, Susie Casteel, testify was prejudicial, despite the fact she was the victim of the Petitioner's alleged extramarital affair. He said that the appellate court ruled the letters Mrs. Casteel wrote to Marie Hill were admissible and that the defense needed Mrs. Casteel to testify that the reason she wrote the letters was to scare Ms. Hill away from her husband, rather than because she believed the Petitioner was a murderer. He said that in addition, in light of the Petitioner's decision not to testify, there were facts that were admissible only through Mrs. Casteel's testimony. Counsel said he did not request a limiting instruction about the content of the letters because he presented proof to explain the reason they were written.

Counsel testified that he attempted to portray Cecil Hickman or his family members as the perpetrator or perpetrators of the crimes. He said he was able to introduce proof of Cecil Hickman and his two sons' being armed and Mr. Hickman confronting Mr. Nixon when Mr. Nixon and Richard Mason were hunting on Mr. Alt's property. He described Mr. Nixon's testimony about Mr. Hickman shooting into the air during this encounter, which had taken place a few months before the crime and about two miles from the crime scene. He

said he elicted other testimony from Mr. Nixon about an incident in which Mr. Hickman drove by Mr. Nixon and Mr. Mason as if he were going to hit them. He said he cross-examined the witnesses who alleged they had encounters with the Petitioner in a manner to demonstrate that their claims were exaggerated. He said that he noticed the witnesses' recounting of events from their statements became worse for the Petitioner over time.

Counsel testified that he did not raise an issue whether all the weapons belonging to the victims of the crimes had been accounted for. He said he did not think raising a self-defense theory was proper because the defense was that the Petitioner did not commit the crimes. He said he also thought it would be counterproductive to attack the character of the victims. He said that he did not think it was sound strategy to raise a defense that the Petitioner was guilty of lesser-included offenses because this was inconsistent with the theory that the Petitioner did not commit the crimes. He said that in his opinion, a self-defense theory would have been unsuccessful due to the evidence that someone disposed of the bodies several miles from the crime scene and disposed of the ATVs several miles from the crime scene in the opposite direction from the bodies. He said the proof showed that one of the victims had been chased through the woods and shot when he was on the ground, which he said was also inconsistent with a self-defense theory. Counsel said he did not cross-examine the State's witness who testified about the number of shots fired because he had relied on a similar strategy in another case in which the defendant claimed to know nothing about the crime.

Counsel testified that although Detective Sneed testified at the first trial that a luminol test was positive for the presence of blood on a blue tarpaulin and testified at the second trial that no blood was found on the tarp, counsel did not cross-examine Detective Sneed about the inconsistency. Counsel said he thought the fact that there was no blood found on the tarp was more beneficial to the Petitioner than any credibility challenge he could have raised based upon the inconsistent testimony. He said that in addition, there was proof that the blue tarp was found and photographed in the Petitioner's home, which negated the State's theory that the tarp was used to drag the victims' bodies to the place where they were dumped and that the tarpaulin had been burned.

Counsel testified that the criminal records of many of the witnesses could not be used for impeachment. He said the records were more than ten years old and inadmissible under the Rules of Evidence. With respect to Mr. Silvey, he said he thought it was counterproductive to impeach his testimony because he thought his testimony was helpful in demonstrating his theory of a sloppy police investigation.

Counsel testified that not letting the jury know that the Petitioner had a prior trial was a "ticklish issue." He said he tried to ask witnesses about "prior testimony" but

acknowledged that John Lines made a comment about testifying at the "first trial." He said he did not object to the witness's response and request a curative instruction because he wanted to avoid drawing attention to it.

Counsel testified that he did not believe in "a shotgun appeal." He said that he preferred to raise the two or three best arguments and that he was mindful of the standard whether the issue would have made a material difference in the outcome of the trial.

Trial counsel testified that he did not request appointment of co-counsel because he did not think co-counsel was needed. He said that some of the other attorneys in his firm worked on the case and that he had an investigator and a paralegal. He said that he had the transcript of the first trial to prepare him for the Petitioner's retrial and that he had a good amount of time to prepare for the retrial.

Trial counsel testified that he did not have a conflict of interests when he accepted appointment in a death penalty case in which Lee Davis, the prosecutor in the Petitioner's case, was lead defense counsel. He said he did not accept this case until after the Petitioner's trial was over. He denied that he made sacrifices of the Petitioner's case in favor of this other case.

Counsel testified that he did not request bond be set for the Petitioner. He said he did not think there would be a chance that bond would be set at an amount the Petitioner could pay. He noted that Petitioner had already been through one trial and had appointed counsel.

Counsel testified that he assumed the Petitioner was shackled at jury selection because he had been determined to be a risk. He said he was unsure whether the Petitioner had been "paraded" in front of the jurors with officers on either side of him. He said jury selection took place in Nashville in a "converted warehouse," which he said he did not recall being cramped. He said he would not have requested a transcript of the jury voir dire when there was no appellate issue about jury selection. He said that he asked the prospective jurors whether they had seen media reports about the case but that he might not have asked them about case information on the Internet.

Counsel testified that he did not recall any infraction of Tennessee Rule of Evidence 615, the witness sequestration rule, taking place. He said, however, that he might not have been aware of witnesses coming into the courtroom behind him and that he had to rely on the judge, the court officers, and other attorneys to enforce the rule.

Counsel testified that he never considered a jury view of the area of the crime. He said the area around Helican Road had changed considerably by the time of the trial. He said

that in addition, he thought it was not a good idea to give the jury a "much more real" image of the murder scene. He said there were photographs to clarify the distinction between the gate and the power lines mentioned in the testimony. He said that he had gone to the murder scene and that it had given him the "creeps bad." He said he recalled the jury being taken to see the Jeep and the ATVs in the first trial but that this was not done in the second trial. He acknowledged that the Petitioner's son still had the Petitioner's Jeep.

Trial counsel testified that he did not request a video-recorded transcript. He said that his practice was to ask the witness questions to clarify any references to exhibits about which they testified.

Trial counsel testified that he did not file a motion to suppress the log book, the gun, or the Jeep. He said these items were provided voluntarily to law enforcement. He said part of the defense theory was to argue that the Petitioner's cooperation with the authorities was evidence of his innocence.

Trial counsel testified that he raised issues as best he could about Marie Hill's testimony. He said the appellate court had ruled that the letters Ms. Hill received were admissible and that he had to consider that ruling in raising any issues about Ms. Hill. He said he did raise a motion in limine and argue an appellate issue about Ms. Hill's testimony.

Counsel testified that he did not have much choice about the county from which the jury was selected. He said that the lawyers who tried the first case told him the rural jury had been a "disaster." He said the demographics of Chattanooga were similar to Nashville, and for that reason, he did not know whether he could have objected successfully. He said he wanted a sophisticated, educated jury.

Counsel testified that there was nothing he could do about the State's misstatement of facts in its appellate brief. He said that he asked the supreme court to take the case after the court of criminal appeals' opinion was filed but that it declined to do so. He said he thought the jury correctly understood the facts.

Counsel testified that he learned during the trial that a witness, Mr. Harden, claimed to have seen the ATVs being dumped down the side of the mountain. He said Mr. Harden saw Cecil Hickman's sons in a truck where the ATVs were later recovered. He said that Mr. Harden claimed that one of the Hickman sons told him to leave and threatened him with a gun. He said that Mr. Harden was able to describe the ATVs accurately and that he did not think Mr. Harden had seen photographs of them. He said that he called this witness despite having some reservations because Mr. Harden was homeless and had some "weird theories" about the case.

Counsel testified that he filed a motion to recuse the district attorney general's office. He said the basis of the motion was that Chris Poole, an assistant district attorney general at the time of the Petitioner's second trial, had worked on the Petitioner's case for Poole's father, Don Poole, who was one of the Petitioner's attorneys at the first trial.

Counsel testified that he also filed a motion in limine with respect to destroyed evidence but that the motion was denied. He said the destroyed items were depicted at trial in photographs or reports.

Counsel testified that he did not think he objected to the photograph of the mud-covered Jeep or the photograph of the ATV with flat tires in the Jeep. He said he thought the mud "might cut a different way" depending on the timing of when Mr. Lines claimed he saw someone washing the Jeep. He also said he probably did not want to object to the pictures of the ATV with flat tires to avoid revealing his theory but that he used this in closing argument.

Counsel testified that he did not object to the proof of phone calls between Ms. Hill and the Petitioner having been taped. He said the conversations were not recorded illegally.

Counsel testified that there was a hearing after a juror saw "he did it" or "he's guilty" written in a restroom and that he had an opportunity to question the jurors. He said that after the hearing, he did not move for a mistrial but that he discussed the matter with the Petitioner. He said he did not think the motion would have been granted.

Counsel testified that he very rarely objected to an opposing party's closing argument. He said he would do so only if there were something "really egregious."

Trial counsel testified that he had practiced law for twenty-six years and that he had conducted thirty to fifty jury trials in criminal cases. He said he had also tried numerous civil cases. He said that his time records reflected over 300 hours of work on the case and that some of his time was not reflected because of a change in his billing system during his representation of the Petitioner.

Counsel testified that although the Petitioner complained that counsel had not given him copies of all the photographs, the Petitioner had seen all the photographs. He said they had discussed them, as well.

Counsel testified that he investigated the Petitioner's theory that someone spilled blood on the crime scene. He said he spoke with the cadaver dog handlers, who denied that this had taken place.

Brian Hackett testified that he was appointed as a defense investigator. He said he no longer had his case file, but he recalled having concerns about the State's investigation. He said he was never convinced the crime scene identified by the State was where the murders occurred. He said he was concerned that a video tape was never obtained which would verify or disprove the claim that the Petitioner's wife had gone to a convenience store. He said he identified at least three people who said they had been confronted when trespassing by someone whose description did not match the Petitioner's.

Mr. Hackett testified that he determined from his investigation that the Petitioner had antagonized the residents of Signal Mountain because he was a newcomer who stopped people from going to the "blue hole" or told them they had to pick up their trash if they went there. He said the Petitioner was different from the long-time residents of the mountain and was perceived as a "jerk." He said he determined that, in contrast to the Petitioner, the Hickman family members "were an institution on the mountain" who would not bother people who did not bother them. He said that by the time he became involved in the case, the elder Hickman male was in the late stages of Alzheimer's or dementia and that the Hickman sons refused to speak with him. He said he did not think the Hickman sons had been questioned by the authorities in 1988. He said he determined that Mr. Mason and the elder Mr. Hickman did not get along. He said his investigation also revealed that Mr. Hickman "played cat and mouse" with Mr. Walling and that Mr. Hickman "would pull guns on everyone that was up there."

Mr. Hackett testified that he did not recall doing background checks on the witnesses. He said, however, this is something he would have done.

Mr. Hackett testified that he located a homeless person, Mr. Harden, who was living in a burned-out house who identified someone other than the Petitioner as having dumped the ATVs. He said he took this person to the courthouse for the trial but did not know whether he testified.

Mr. Hackett testified that he located three people who said they had been confronted by the Hickman sons. He said that only one of these three people was willing to testify. He said he found witnesses who said they had seen low-flying airplanes in the area that were picking up and dropping off drugs. He said he never saw any low-flying planes during his investigation.

Mr. Hackett testified that he located all of the witnesses and spoke with them in person and then found the witnesses a second time for counsel to meet with them before trial. He said he and trial counsel went to the "blue hole." He said that he spent many hours with

counsel in counsel's office. He said he also spent considerable time with the Petitioner and provided him with written and verbal updates.

Mr. Hackett testified that his investigation was thorough and that trial counsel had accompanied him during many parts of it. He said that based upon investigation, he did not believe the Petitioner had committed the crime. He said that if his life were on the line, he would call upon the Petitioner's counsel to defend him.

Leland Davis testified that he was a member of the prosecution team at both of the Petitioner's trials and that he presented the case to the grand jury. He said he did not know whether the grand jury was screened. He said that despite the case having received extensive media coverage, he believed the grand jury could be impartial because "most jurors don't pay attention to the particular facts of a high profile case the way the attorneys do, and they often confuse one case with another[.]" He said that Marie Hill did not testify before the grand jury but that Detective Sneed did.

Mr. Davis testified that the Petitioner's second trial was in May 2003 and that he was not appointed to serve as lead counsel with the Petitioner's trial counsel as co-counsel in the Billington capital case until August 28, 2003. He said he and the Petitioner's trial counsel never discussed the Petitioner's case during their work together on the Billington case.

Mr. Davis testified that he did not know the victims' families before he was asked by Detective Sneed to review the case. He acknowledged that he became friends with some of the victims' family members in the years the case was pending. He said that at the time he began working on the prosecution of the Petitioner for the murders, he was unaware he had previously prosecuted the Petitioner for shooting a neighbor's light. He said that during the course of the murder case, he discovered information in his file and remembered the previous prosecution.

Mr. Davis testified that the State was interested in developing DNA evidence from soil collected at the crime scene. He said that a sample had been tested which revealed the possible presence of human blood but that further classification was not possible from the sample. He said the testing was to see whether the soil collected at the gate could be tied to the victims and would not have exonerated the Petitioner. He said that he seemed to remember that a report was not generated because of the speculative nature of the conclusion. He said some of the samples were destroyed by the TBI in the years between 1988 and 1996. He said that the State was forthcoming with the Petitioner's attorneys at the first trial about the trace evidence, which also included the Petitioner's wife's DNA on the anonymous letters.

Jerry Summers testified that he was an experienced trial attorney and that he had reviewed the portions of the transcripts of both of the Petitioner's trials that contained GBI Agent Kelly Fite's testimony. He said that his concern was not with Agent Fite's qualifications as an expert witness but with the lack of a hearing on the admissibility of his testimony given the methodology employed, under the legal principles of McDaniel v. CSX Transportation, 955 S.W.2d 257 (Tenn. 1997), and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), as they existed at the time of the first trial. He said he thought that although Agent Fite's testimony did not eliminate the shotgun as the murder weapon, the testimony "created a strong inference . . . that [the witness] excluded the other guns that might have had similar findings." He said that had counsel objected, the question of unfair prejudice could have been considered under Tennessee Rule of Evidence 403. He said that according to the transcript, Agent Fite based his opinion about the markings on the shotgun wadding on one study conducted in the 1970s and the agent's own experience.

Mr. Summers testified that the Petitioner's family consulted with him after the first trial and although he did not assume representation of the Petitioner, he was concerned at that time about the admissibility of the statements of the Petitioner's wife and girlfriend under Tennessee Rule of Evidence 403. He said that in his opinion, the Petitioner's testimony denying that he had threatened "very reputable people" was the critical factor in the first trial. He said that if the Petitioner made the decision to testify, "he's got what he deserves as far as what happened to the verdict[.]"

District Attorney Bill Cox testified that he thought Detective Sneed testified adequately about the photographs and reports. He said he made all evidence available to the defense for both trials. He testified that he handled the shotgun and cocked it in front of the jury. He said he did not think this was improper. He said he thought the State's witnesses testified truthfully. He said it was typical for variances to occur in multiple statements and testimony given by witnesses.

Larry Sneed testified that he was the lead detective in the Petitioner's case. He said he was no longer with the Hamilton County Sheriff's Department, having become the chief of the Red Bank Police Department. He said that on July 10, 1988, they learned of three ATVs with blood on them and knew that the victims were missing. He said that the next day, they established a command post and investigated the area not knowing whether the victims could be recovered safely. He said that they found blood at the Helican Gate and in three pools on either side of the road and that cadaver dogs assisted in locating some of the blood. He said that when they found blood at the gate, they also noticed drag marks leading to the side of the road, blood, insects, and what appeared to be brain material covered by leaves near the base of a tree. He said that someone had taken a long time to conceal their discovery.

He said they found eyelets with blue material melted around them in a fire pit eight-tenths of a mile away on the Petitioner's property.

Chief Sneed testified that officers at the command post learned from individuals they interviewed that they had heard shots on the night of July 9. These individuals also warned the officers to be careful because if they went onto the Petitioner's property, he would hold a shotgun on them. He said that some of these witnesses were able to identify the Petitioner by name but that others were not. He said this was the first time he heard the Petitioner's name. He said the authorities met with the owners of property near the Helican Gate. He said that despite the Walden family claiming ownership of the gate area and witnesses stating that the Petitioner was the only person who posted "no trespassing" signs in the area, the confrontations the witnesses alleged having with the Petitioner had taken place at the Helican Gate.

Chief Sneed testified that the Petitioner appeared as requested, although late, for a meeting at the command post. He said that this was after the physical evidence had been discovered but that the Petitioner was not yet a suspect. Chief Sneed testified that he did not recall whether he testified at the first trial that there was blood on the blue material recovered from the fire pit. He acknowledged his testimony at the second trial that the material tested negative for blood. He stated they investigated multiple suspects and that they received many reports. He said reports about all of this were provided to the district attorney.

Chief Sneed testified that there was a shell from a handgun found at the location where the bodies were recovered. He said he learned that the area was a dump site for trash and that people also went to the area to fire weapons. He said the victims' wounds were all from shotgun blasts.

Chief Sneed testified that the ATVs were stored for a long period of time and that the tires deflated. He said two of the ATVs were eventually returned to their owners.

After receiving the evidence, the trial court issued a lengthy written order which addressed all of the allegations raised in the Petitioner's several petitions and denied relief on each. This appeal followed.

The burden in a post-conviction proceeding is on the Petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency

was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Failure to satisfy either prong results in the denial of relief. Id. at 697.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

All of the Petitioner's appellate issues involve allegations of ineffective assistance of counsel. We will address each in turn.

# I

The Petitioner contends that trial counsel's strategy was so deficient that he received the ineffective assistance of counsel. The State argues that the Petitioner failed to prove either prong of the <u>Strickland</u> test and is not entitled to relief.

The Petitioner attacks trial counsel's decision to pursue an alternative perpetrator theory, rather than raising challenges to every aspect of the State's theory. He attacks numerous individual decisions made by trial counsel that were part of the overall defense strategy. These include trial counsel's decision not to challenge the State's theory regarding where the crimes took place, the circumstantial nature of the evidence, the missing witnesses, the lack of police reports introduced as part of the State's case, the State's timeline, the lack of impeachment of Officer Sneed's testimony and credibility, the lack of objection to the State's closing argument, the decision to use the Petitioner's wife's testimony, the failure to raise the issue of bias of the trespasser witnesses, the decision not to request a mistrial after a juror saw "he did it" on a bathroom mirror, and the failure to request special jury instructions about the letters from the Petitioner's wife to Ms. Hill.

The record reflects that trial counsel conducted a thorough investigation of the case and had the benefit of the transcript of the Petitioner's first trial and that he chose the alternative perpetrator theory as the best course available. Counsel testified that he chose not to challenge certain weaknesses in the State's proof because pursuing a self-defense theory would have been inconsistent with the primary defense theory and would have been ill-advised. The trial court accredited counsel's testimony about the diligent work he performed in the course of representing the Petitioner and his choice of strategy based upon his preparation. The court found:

> It is clear that the advice given and the services rendered to the Petitioner in this case . . . were clearly within the range of competence demanded of attorneys in criminal cases. Indeed, it is clear that [trial counsel] worked very hard, kept his focus on the Petitioner's defense that he was not the killer of the men.

We hold that the evidence does not preponderate against the trial court's findings. Thus, the Petitioner is not entitled to relief on the basis that counsel's strategy amounted to deficient performance.

## II

Second, the Petitioner alleges that counsel was deficient in failing to object to GBI Agent Kelly Fite's expert testimony and in failing to request a hearing to determine the admissibility of the evidence pursuant to the principles of McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257, 263-64 (Tenn. 1997). The Petitioner does not challenge Agent Fite's qualifications as an expert. Rather, he contends that the relevance of the prejudicial effect of the testimony and the methodolgy used by the expert are in question. The State responds that counsel was not ineffective because counsel believed the witness to be qualified.

Rules 702 and 703 of the Tennessee Rules of Evidence address the admissibility of opinion testimony of expert witnesses. Rule 702 states in pertinent part: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tennessee Rule of Evidence 703 requires the expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." State v. Stevens, 78 S.W.3d 817, 834 (Tenn. 2002). Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course.'" State v. Murphy, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting State v. Bolin, 922 S.W.2d 870, 874 (Tenn. 1996)). Questions regarding the admissibility, qualifications, relevancy, and competency of expert testimony are left to the discretion of the trial court. McDaniel, 955 S.W.2d at 263-64.

The Petitioner claims the evidence should have been excluded because it was substantially more prejudicial than it was relevant or probative. See T.R.E. 403. He claims that Agent Fite's testimony helped the jury conclude that it was his shotgun that was used to kill the victims. However, he argues, Agent Fite was not able to match the gun with markings, and Agent Fite based his opinion evidence that the Petitioner's gun was capable of firing without leaving markings on the wadding on a single study the witness conducted in the 1970s. Additionally, he argues, shotgun ballistic testing was not done in Tennessee at the time.

The Petitioner seeks to equate Agent Fite's opinion testimony that the waddings did not have markings and that the Petitioner's gun did not leave markings when fired with the type of advancing scientific knowledge that must be subject to the threshhold admissibility requirements of McDaniel. First, it is significant that Agent Fite did not testify that in his opinion, the Petitioner's weapon fired the wadding that killed the victims. Rather, he said

the Petitioner's weapon was capable of doing so because neither the fatal wadding nor the wadding he test fired had markings. Agent Fite was a firearms examiner, and his qualifications in that field were well known to trial counsel, who was familiar with Agent Fite from other cases. Counsel believed the witness was qualified to testify on the subject and did not request a McDaniel hearing. The Petitioner is not entitled to relief on this basis.

**III**

Next, the Petitioner argues that trial counsel was ineffective for failing to obtain a defense expert witness in the areas of acoustics engineering and ballistics. The State responds that the trial court's findings were proper.

**A.     Acoustics Engineer**

With respect to the allegations that counsel should have obtained a defense acoustics engineer, the trial court found:

> [T]he Petitioner faulted his counsel for not employing an expert regarding the ability to hear shots fired. The ability to hear shots or anything else varies from individual to individual, depending on their aural acumen, their age and numerous other factors. It is inconceivable that an expert could testify what another person could or could not hear from a particular distance.

At the post-conviction hearing, trial counsel testified that he investigated the witnesses who claimed they heard shots coming from the "blue hole." He said there was no need for a defense expert to show that a person could not have heard the shots claimed by the witnesses because the State conceded as much at trial. He also testified that the defense team conducted its own experiment, which resulted in a person at the "blue hole" being able to hear a shotgun fired from the campsite to the gate. He said that given the results of the defense experiment, presenting a defense expert was inviting the expert to contradict the State's proof.

This court has reviewed the record of the Petitioner's direct appeal from the second trial. The record reflects that counsel elicited testimony during his cross-examination of Detective Sneed that the authorities fired a shotgun at the gate and were not able to hear the blast at the "blue hole." In addition, counsel raised this issue in his appellate brief as part of his challenge to the sufficiency of the evidence.

The Petitioner contends that an acoustics expert could have shown "he could have been nearby at the blue hole and heard nothing, as well as challenged the State's witnesses regarding what they said they heard, and where they said it was coming from." However, he offered no expert proof at the post-conviction hearing which, had it been offered at trial, would have been favorable for the defense. Before his trial, the defense conducted its own experiment, in which a person at the "blue hole" was able to hear a shotgun fired from the Helican Road gate. Knowing this, counsel exercised informed discretion in not pursuing an acoustics expert and instead in eliciting Detective Sneed's concession that the State's experiment failed to show that a gunshot fired from the gate could be heard at the "blue hole." The Petitioner had the burden of proving his claims by clear and convincing evidence. The trial court correctly denied relief on this claim.

## B.    Ballistics Expert

The Petitioner also argues that counsel was ineffective for not obtaining a defense ballistics expert. The trial court's pertinent findings are as follows:

> The Petitioner faulted his defense counsel for not employing expert witnesses to counter the [GBI] ballistic expert's testimony. The only ballistic testimony at the second trial came from Mr. Fite of the Georgia Bureau of Investigation. He testified that the wad material had no identifiable marks to match with the Petitioner's shotgun and that his shotgun was capable of firing wad material without identifiable marking. He simply could not conclude that the Petitioner's shotgun had fired the wad material he analyzed. The shotgun shells were not sent to the GBI for analysis, so there was no proof presented about the shells. In short, there was simply nothing to refute.

Upon review, we hold that the evidence does not preponderate against these findings. The State's expert was not able to conclude that the Petitioner's shotgun fired the fatal shots. A defense expert who testified to that fact, as well, would not have made an acquittal more likely, and counsel's performance was not deficient for his choosing not to pursue such redundant proof. Additionally, the Petitioner failed to present any expert proof at the post-conviction hearing of ballistics evidence that would have been favorable to the defense at trial. Jerry Summers' testimony that the issue should have been raised and might have resulted in a different evidentiary ruling is no more than speculation in the absence of evidentiary ballistics proof that would have been favorable to the Petitioner. The trial court did not err in denying relief.

## IV

The Petitioner next argues that trial counsel was ineffective for failing to object to the State's closing argument at trial and to raise an issue about it on appeal. The Petitioner has recited various specific statements made by the district attorney during closing argument which he contends were objectionable, but he has not explained how any of these specific arguments were legally improper. The State argues that the Petitioner has waived this issue by failing to cite to the record where this issue was raised in the post-conviction petition.

In its order denying relief, the post-conviction court found:

> [T]he Petitioner claims that the State's argument was improper and his counsel did not object. The State is entitled to hit hard licks in closing argument. Of course, the licks must be based on the evidence. The Petitioner has not set forth what part of the closing argument he believes was erroneous and subject to objection.

The Petitioner has failed to explain any legal basis upon which counsel should have objected to the closing argument. He has likewise failed to explain how he was prejudiced by the lack of objection. The trial court did not err in denying post-conviction relief.

## V

Finally, we note that the Petitioner raised numerous additional issues of ineffective assistance of counsel in his post-conviction petition and in the amendments to the petition. He had a lengthy hearing and was afforded the opportunity to present proof. The trial court addressed each allegation individually, finding that the Petitioner failed to sustain his burden of proof with respect to each. The Petitioner has listed twenty-six additional allegations of ineffective assistance of counsel in his brief, all of which were determined to be without merit by the trial court. He has not provided any argument why the trial court erred with respect to these issues, and none is apparent.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE